UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

IN THE MATTER OF THE COMPLAINT OF
COLUMBIA LEASING L.L.C.,
AS PREVIOUS OWNER,
COLUMBIA COASTAL TRANSPORT, L.L.C.,
AS PRESENT OWNER AND PREVIOUS OWNER
PRO HAC VICE OF THE BARGE
COLUMBIA HOUSTON, OFFICIAL NO. 694869,
AND ITS EMPLOYEE, LARRY WARD,

Plaintiff-Petitioners,

v.                                          Civil Action No. 2:12cv678

JOHN R. MULLEN, II AND
KAREN MULLEN,

Claimants,

v.

CERES MARINE TERMINALS, INC, AND
CERES MARINE TERMINALS INCORPORATED,

Claimants.

## OPINION AND ORDER

This matter is before the Court on a motion for summary judgment filed by Columbia Coastal Transport, L.L.C. ("Columbia Coastal") and Larry Ward ("Ward") (collectively "Plaintiffs"), as well as a motion filed by John R. Mullen, II and Karen Mullen ("the Mullens") pursuant to Fed. R. Civ. P. 56(d), asserting that they cannot present facts essential to justify their opposition to the summary judgment motion. After examination of the record of this matter as a whole, the Court has determined

that a hearing on the instant motion is unnecessary, as the facts and legal arguments are adequately presented, and the decisional process would not be aided significantly by oral argument. Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J). For the reasons discussed below, the Mullens' Rule 56(d) motion is **DISMISSED AS MOOT** and Plaintiffs' motion for summary judgment is **GRANTED**.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts in this case are largely undisputed. Longshoreman John Mullen ("Mullen") alleges that he was injured at the Portsmouth Marine Terminal ("PMT") in Portsmouth, Virginia on August 31, 2009, when attempting to board the COLUMBIA HOUSTON ("the barge"), owned by Columbia Leasing, LLC ("Columbia Leasing") and bareboat chartered to Columbia Coastal. ECF No. 19. On that date, Ward was the port captain employed by Columbia Coastal. Columbia Coastal hired tug boats to tow the barge to the dock and a stevedore ("Ceres") to conduct the loading and unloading of containers to and from the barge. Ceres contracted with Express Container Services ("Express") to service the refrigerated containers on the barge. Mullen, a refrigerated container ("reefer") mechanic employed by Express, was scheduled to disconnect the power to the reefer units on the barge when it arrived at the PMT on August 31, 2009.

2

When the barge was docked at the PMT, a three-to-four-foot gap separated the barge from the dock, at least in part because of the bumpers/fenders between the dock and the barge.  Although a ladder was permanently affixed to the side of the barge, because of the gap between the barge and the dock, the ladder could be used only when it aligned sufficiently with a bumper/fender located on the dock, which rarely occurred.  In addition, Mullen was the only reefer mechanic assigned to the barge.  The refrigerated containers were located in multiple sections of the barge.  This required Mullen to board the barge at various times and locations in order to service the particular container being loaded or unloaded.  Thus, for more than twenty years, the stevedores at the PMT chose to use a forklift and metal basket, located on the dock, to provide access from the dock to the barge.  On August 31, 2009, at approximately 4:00 a.m., Mullen was required to service a refrigerated unit located near the barge's ladder.  He entered a metal basket situated on the prongs of a Ceres-owned forklift.  The forklift's prongs were inserted into slots on the bottom of the basket.  A Ceres employee then lifted the basket on the forklift and drove toward the barge in order to deliver Mullen to the barge.  However, as the basket approached the barge, the end of one of the forklift's prongs caught the side of the barge's ladder during the maneuvering of the metal basket,

3

causing Mullen to be thrown about inside the basket when the prong was dislodged.

The Mullens filed a personal injury lawsuit in Portsmouth Circuit Court against Columbia Leasing, Columbia Coastal, Ward, and Ceres. On December 13, 2012, Columbia Leasing, Columbia Coastal, and Ward (collectively "Limitation Plaintiffs") filed in this Court a Complaint seeking exoneration from or limitation of liability. ECF No. 1. On February 25, 2013, this Court issued an injunction, pursuant to the Limitation of Liability Act, 46 U.S.C. § 30501, et seq., staying activity in the Portsmouth Circuit Court lawsuit. ECF No. 10 (amended February 28, 2013, ECF No. 11). On April 11, 2013, Ceres filed an Answer and Claim, seeking contribution from Limitation Plaintiffs in the event that "Ceres and Columbia are found jointly liable for the Mullens['] injuries." Ceres' Answer & Claim at ¶ 11, ECF No. 14. On April 23, 2013, the Mullens filed their Amended Answer, Claims, and Crossclaims to the Limitation Plaintiffs' Complaint. ECF No. 19. The Mullens asserted claims for personal injury under maritime law (by Mullen) and loss of consortium (by Mullen's wife) against Columbia Coastal and Ward.[1] According to the Mullens, both Mr. Mullen's injuries and Mrs. Mullen's loss of consortium were "a direct and proximate result

---

[1] The Mullens have not asserted any claims in this Court against Columbia Leasing. Columbia Leasing filed a Second Motion for Default Judgment against the Mullens, which the Court granted on December 30, 2013. ECF No. 77.

4

of the negligence" of Columbia Coastal and/or Ward.  Id. ¶¶ 24,
28.  By order of May 6, 2013, the Court scheduled a December 17,
2013 trial date.  ECF No. 20.[2]  On August 28, 2013, Plaintiffs
filed the instant motion for summary judgment against the
Mullens.  ECF No. 46.  The Mullens filed their brief in
opposition on September 11, 2013.  ECF No. 55.  In their
response, the Mullens also seek relief under Federal Rule of
Civil Procedure 56(d), requesting that the Court deny
Plaintiffs' motion for summary judgment as to Ward or, in the
alternative, delay its ruling as to Ward until the Mullens can
complete their discovery.  Plaintiffs filed a reply brief on
September 17, 2013.  ECF No. 56.  Accordingly, the matter is now
ripe for decision.

## II. STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that a
district court shall grant summary judgment in favor of a movant
if such party "shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law."  Fed. R. Civ. P. 56(a).  The mere existence of some
alleged factual dispute between the parties "will not defeat an
otherwise properly supported motion for summary judgment; the
requirement is that there be no genuine issue of material fact."
Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986).  If

---

[2] By order of October 17, 2013, the December 17, 2013 trial date
was continued, at the parties' request, to April 15, 2014.  ECF No.
69.

the pleadings, affidavits, deposition transcripts, and other discovery materials demonstrate that there is no genuine dispute as to a material fact, "it is the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" Hostettler v. Auto-Owners Ins. Co., 744 F. Supp. 2d 543, 545 (E.D. Va. 2010) (quoting Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993)).

If a movant has properly advanced evidence supporting entry of summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits and sworn statements illustrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In doing so, the judge must construe the facts and all "justifiable inferences" in the light most favorable to the non-moving party, and the judge may not make credibility determinations. Id. at 255; T-Mobile Ne. LLC v. City Council of Newport News, 674 F.3d 380, 385 (4th Cir. 2012). After viewing the evidence in the non-movant's favor, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the

[non-movant] on the evidence presented." Anderson, 477 U.S. at 252. Because a ruling on summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits[,] . . . [t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to overcome a defendant's well-founded summary judgment motion. Id. Accordingly, if the non-movant's evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50.

### III. DISCUSSION

### A. The Mullens' Rule 56(d) Motion

Plaintiffs filed their summary judgment motion on August 28, 2013. On September 5, 2013, the Mullens filed a Motion to Compel "complete" Answers and Responses from Columbia Coastal to certain interrogatories and requests for production. ECF No. 51. The Mullens alleged that Columbia Coastal had "objected to some but not all of the requested discovery," but asserted that the Motion to Compel should be granted because the "requested discovery is reasonable" and "within the scope of discovery authorized by Fed. R. Civ. P. 26(b)(1)." Defs.' Mem. in Supp. at 1, ECF No. 52. On September 10, 2013, the Mullens filed a Second Motion to Compel the depositions of Columbia Coastal and Ward. ECF No. 53. The Mullens claimed that Plaintiffs'

7

"refusal to make themselves available for deposition is prejudicing the Mullens' efforts to present their claims to this Court" and to respond to Plaintiffs' "Motion for Summary Judgment." Defs.' Mem. in Supp. of Second Mot. to Compel at 4, ECF No. 54.

On September 11, 2013, one day after filing their Second Motion to Compel, the Mullens filed their response to Plaintiffs' Motion for Summary Judgment. Pursuant to Federal Rule of Civil Procedure 56(d), the response requested that the Court deny Plaintiffs' Motion for Summary Judgment as to Ward or, alternatively, delay ruling on the motion until the Mullens could complete the necessary discovery to adequately respond to Plaintiffs' Motion for Summary Judgment. Defs.' Br. in Opp'n at 24, ECF No. 55. As required by Rule 56(d), Mullens' counsel stated in a sworn declaration that he had been "unable to develop facts necessary to oppose the Motion for Summary Judgment filed by Petitioner Larry Ward" and that he specifically needed "complete responses to the Mullens' federal discovery to Columbia Coastal and the deposition of Larry Ward," in order to oppose Ward's summary judgment motion, Jackson Decl. ¶¶ 4, 12, ECF No. 55-4. Counsel listed the information he "expect[ed] to obtain," asserting that such information would "enable [him] to oppose Larry Ward's Motion for Summary Judgment." Id. ¶ 12.

On September 23, 2013, counsel for Plaintiffs responded to both of the Mullens' Motions to Compel, asserting that Columbia Coastal had "recently" provided the discovery requested in the Mullens' first Motion to Compel and that counsel thus "anticipate[d] that [the Mullens] will withdraw [the] motion to compel or at least state what they believe remains outstanding so that [Plaintiffs] may rectify if possible." Pls.' Br. in Opp'n at 2, ECF No. 57. Counsel for Plaintiffs also asserted that counsel had recently scheduled the depositions of Columbia Coastal and Ward to be taken on October 9, 2013. Id. Thus, counsel requested that the Court find both Motions to Compel "moot and, consequently[,] that [they] be denied." Id. at 2-3. The Mullens did not file a reply to Plaintiffs' response.

On October 11, 2013, two days after the depositions of Plaintiffs were scheduled to occur, the Court held an on-the-record telephonic status conference with counsel for all parties, where the Court discussed the case status with counsel and, pursuant to the request of all counsel, continued the trial to April 15, 2014. At the conclusion of the conference, when the Court asked counsel if they had "anything else" to discuss, counsel for the Mullens responded, "No, thank you, Judge." Telephone Conference Tr. at 19, ECF No. 64. Since the filing of both Motions to Compel and the Mullens' Brief in Opposition to Plaintiffs' Motion for Summary Judgment, the Mullens have filed

no further pleadings pursuant to Local Rule 37(E) regarding the discovery disputes.[3]  Nor have the Mullens requested permission "to serve a supplemental pleading" based on any relevant facts obtained from those interrogatories, requests for production, or depositions "after the date of the [Mullens' response to Plaintiffs' Motion for Summary Judgment."  Fed. R. Civ. P. 15(d).  Furthermore, with respect to the facts counsel for the Mullens "expect[ed] to obtain," Jackson Decl. ¶ 12(a)-(i), ECF No. 55-4, the Court notes that, as the following discussion of Plaintiffs' Motion for Summary Judgment will demonstrate, none of those facts were required by the Court to answer such motion.

Therefore, for the reasons discussed, it is apparent to the Court that the discovery disputes have been resolved as to both of the Mullens' Motions to Compel, and that the Mullens have not obtained any information "after the date of the [response to Plaintiffs' Motion for Summary Judgment]," requiring the Mullens' response "to be supplemented."  Fed. R. Civ. P. 15(d). In any event, because "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment," Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (citation and internal

---

[3] Local Rule 37(E) states, in part, that "[t]he Court will not consider any motion concerning discovery matters unless the motion is accompanied by a statement of counsel that a good faith effort has been made between counsel to resolve the discovery matters at issue."

quotation marks omitted), the Court **DISMISSES** the Mullens'
request for Rule 56(d) relief as **MOOT**.

### B. Plaintiffs' Motion for Summary Judgment

Plaintiffs seek summary judgment on their claim for
exoneration from or limitation of liability pursuant to the
Limitation of Liability Act, 46 U.S.C. § 30501, et seq.,
alleging that the undisputed evidence shows no breach by
Plaintiffs of "any of the duties owed to a longshoreman by a
vessel owner as established by the Supreme Court," Pls.' Mot.
for Summ. J. at 2, ECF No. 46 (citing Scindia Steam Navigation
Co. v. De Los Santos, 451 U.S. 156, 167-68 (1981)).[4] The Mullens
argue that summary judgment is not appropriate in this case
because "there is a genuine dispute concerning material facts
relating to whether or not Columbia Coastal breached its
turnover duty and . . . its duty to intervene." Defs.' Br. in
Opp'n at 1, ECF No. 55.[5]

---

[4] "Under the Limitation of Liability Act, a shipowner can limit
its liability to the value of its vessel and pending freight, provided
that the accident occurred without the privity or knowledge of the
owner." Norfolk Dredging Co. v. Wiley, 357 F. Supp. 2d 944, 946 (E.D.
Va. 2005) (citing Robert Force, Admiralty and Maritime Law 133
(2004)); see also 46 U.S.C. § 30505(a)-(b). "A court faced with a
limitation action should proceed in two steps: (1) determine whether
the accident was caused by the negligence of the vessel; and, if so,
(2) determine whether the vessel owner had privity and knowledge of
those acts." In re Complaint of Christiansen Marine, Inc., 1996 AMC
2353, 2363 (E.D. Va. 1996). If the court determines the shipowner was
not negligent, the shipowner "is entitled to exoneration from all
claims against it." Id. at 2366.

[5] Plaintiffs assert that the Court should consider as undisputed
all of the facts in Plaintiffs' brief because the Mullens failed to
comply with Local Civil Rule 56, which requires the brief in

### 1. Longshoremen's Pre-1972 Remedies against a Vessel

Before Congress extensively revised the Longshore and Harbor Workers Compensation Act ("LHWCA") in 1972, a series of Supreme Court opinions enabled longshoremen to bring seaworthiness claims against a vessel for virtually any injury received aboard the vessel. First, in <u>Mahnich v. Southern S.S. Co.</u>, 321 U.S. 96 (1944), the seaworthiness doctrine, which originally held only a shipowner liable for furnishing an unseaworthy vessel, was broadened to include appliances of the vessel rendered unseaworthy by the negligence of the vessel's officers or crew members. Two years later, in <u>Seas Shipping Co. v. Sieracki</u>, 328 U.S. 85 (1946), the Supreme Court extended this broad no-fault seaworthiness duty to longshoremen. The Court later extended the shipowner's no-fault liability to unseaworthy conditions caused by the negligence of a third party, such as a stevedore. <u>Alaska S.S. Co. v. Petterson</u>, 347 U.S. 396 (1954). Recognizing the inequity of shifting the entire burden of a third party's negligence onto the shipowner, the Supreme Court

---

opposition to "include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated." ECF No. 56 at 2 (quoting Local Civil Rule 56 and citing <u>Kolon Indus., Inc. v. E.I. du Pont De Nemours & Co.</u>, No. 3:11cv622, 2012 U.S. Dist. LEXIS 48722 (E.D. Va. Apr. 5, 2012)). In <u>Kolon</u>, although the non-moving party was found to be in violation of the local rule, the Court stated that, "given the significance of summary judgment and considering the interest of justice, it is preferable to determine the motion on its merits, rather than on [a] breach of Local Civil Rule 56(B)." <u>Kolon</u>, 2012 U.S. Dist. LEXIS 48722, at *28. On the particular facts of this record, the Court agrees.

held that shipowners could seek indemnity from the stevedore on the theory that the stevedore had breached its implied warranty of workmanlike performance to the shipowner.  Ryan Stevedoring Co. v. Pan-Atl. S.S. Corp., 350 U.S. 124 (1956).  In addition, because a longshoreman's receipt of worker's compensation benefits under the pre-1972 LHWCA did not prohibit him from bringing an additional third-party action against the vessel, stevedores faced a sort of double liability, requiring them to pay worker's compensation payments to their employee longshoremen, as well as indemnify shipowners for damages awarded to the longshoremen in third-party negligence actions. See, e.g., Kakavas v. Flota Oceanica Brasileira, S.A., 789 F.2d 112, 117 (2d Cir. 1986) (Friendly, J.) (describing the pre-1972 Amendments "series of frustrations," which required the "stevedore, whose liability was to have been limited by § 905(a) to the workmen's compensation payments to the injured employee," to also pay "the larger amounts awarded against the ship").

The 1972 Amendments to the LHWCA "radically changed this scheme of things." Scindia, 451 U.S. at 165.  In exchange for "substantially increased" worker's compensation payments to the injured longshoreman, his "right to recover [from the vessel] for unseaworthiness was abolished," although "his right to recover from the shipowner for negligence was preserved." Id.

13

In addition, "the stevedore's obligation to indemnify the shipowner . . . was abolished." Id.

## 2. Duties Owed by a Vessel to Longshoremen

Section 905(b) of the LHWCA now "permits a longshoreman to 'seek damages in a third-party negligence action against the owner of the vessel on which he was injured.'" Bunn v. Oldendorff Carriers GmbH & Co., 723 F.3d 454, 460 (4th Cir. 2013) (quoting Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 96 (1994)).[6] "While Congress created a cause of action against the shipowner in negligence in § 905(b), it left to the courts the task of defining the duties the shipowner owed to the longshoreman." Lincoln v. Reksten Mgmt., 354 F.3d 262, 266 (4th Cir. 2003) (citing Scindia, 451 U.S. at 165-66). Taking on that task, the United States Supreme Court in Scindia recognized "three general duties shipowners owe to longshoremen:" 1) the "turnover duty," which "relates to the condition of the ship upon the commencement of stevedoring operations;" 2) the "active control" duty, which applies "once stevedoring operations have begun [and] provides that a shipowner must use reasonable care to prevent injuries to longshoremen in areas that remain under the active control of the vessel;" and 3) the "duty to intervene," which "concerns the vessel's obligations with regard

---

[6] None of the parties dispute that Mullen is a maritime worker covered by the LHWCA, or that the barge is a "vessel" as defined in 33 U.S.C. § 902(21). Thus, Section 905(b) is the only means by which the Mullens may recover against the barge for vessel negligence. See 33 U.S.C. § 905(b).

to cargo operations in areas under the principal control of the independent stevedore." Howlett, 512 U.S. at 98 (internal quotation marks omitted) (citing Scindia, 451 U.S. at 167–78).

### a. Turnover Duty

The Mullens assert that Plaintiffs breached the "turnover duty" because they failed to deliver "the vessel and its means of ingress and egress in a reasonably safe condition." Defs.' Br. in Opp'n at 13, ECF No. 55. Plaintiffs respond that their turnover duty did not include the forklift-and-basket means of ingress and egress because "the stevedore owned the forklift and basket." Pls.' Br. at 15, ECF No. 47. Plaintiffs further assert that "the vessel had its own ladder by which people might gain access to the barge and it was the stevedore's choice to use the forklift and basket instead of the ladder." Id. at 16. In any event, Plaintiffs contend, any alleged hazard related to the forklift and basket was "open and obvious," thus relieving Plaintiffs of any duty to warn. Id.

The turnover duty, as defined by the Supreme Court, requires a vessel owner to:

> "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able in the exercise of ordinary care" to carry on cargo operations with "reasonable safety to persons and property."

15

Howlett, 512 U.S. at 98 (quoting Fed. Marine Terminals, Inc. v. Burnside Shipping Co., 394 U.S. 404, 416 n.18 (1969) and citing Scindia, 451 U.S. at 167). Sometimes referred to as a "duty of safe condition," see, e.g., Bunn, 723 F.3d at 465 n.13, the turnover duty does not obligate a vessel owner "to turn over a vessel in perfect condition," 1 Robert Force & Martin J. Norris, The Law of Maritime Personal Injuries § 8:32, at 8-134 (5th ed. 2013). To be sure, the "stevedore, as the longshoreman's employer," is required by statute to "provide a 'reasonably safe' place to work," Scindia, 451 U.S. at 170 (quoting 33 U.S.C. § 941), but the vessel owner "is not the common employer of the longshoremen and owes no such statutory duty to them," id. Furthermore, the turnover duty presumes an "expert and experienced" stevedore, who "should reasonably expect to encounter" certain dangers "arising from the hazards of the ship's service or otherwise." Fed. Marine Terminals, 394 U.S. at 416 n.18. Accordingly, the ship need only be delivered in a reasonably safe condition, free from only those "hazard[s that] would have been neither obvious to nor anticipated by a skilled and competent stevedore at the discharge port." Howlett, 512 U.S. at 106.

"A corollary to the turnover duty" places on a vessel owner a duty to warn the stevedore of latent hazards existing "on the ship or with respect to its equipment" that are "known to the

vessel or should be known to it in the exercise of reasonable care" and that "would likely be encountered by the stevedore in the course of his cargo operations." Id. at 98-99 (citing Scindia, 451 U.S. at 167; Fed. Marine Terminals, 394 U.S. at 416 n.18). However, "[i]f a defect is open and obvious and the stevedore should be able to conduct its operations around it safely, the shipowner does not violate the duty to warn." Lincoln, 354 F.3d at 266 (citing Bonds v. Mortensen & Lange, 717 F.2d 123, 127-28 (4th Cir. 1983)). This is in accord with the general proposition that the "primary burden" is placed upon "the stevedore for avoiding injuries caused by obvious hazards." Scindia, 451 U.S. at 180 (Powell, J., concurring). Thus, "there can be no recovery under [33 U.S.C. § 905(b)] for a vessel's failure to warn of dangers that would be apparent to a longshoreman of reasonable competence." Howlett, 512 U.S. at 104 (citing Scindia, 451 U.S. at 167). In short, the turnover duty requires a shipowner to "exercise due care to ensure that the ship is safe enough when turned over to the stevedore to allow the stevedore, exercising reasonable care, to perform cargo operations safely, and that the stevedore be warned of any hidden defects that are known or should be known to the shipowner." Deyerle v. United States, 149 F.3d 314, 316 (4th Cir. 1998).

17

Here, the Mullens do not specifically assert that the barge, its equipment, or its appliances were delivered in an unsafe condition, or that Plaintiffs failed to warn of any latent hazards on the barge. Nor do the Mullens dispute that Ceres owned, maintained, and operated the forklift-and-basket method of accessing the barge. Rather, the Mullens ask this Court to extend the Scindia turnover duty, as a matter of law, to include "the means of vessel ingress and egress, even when the means of ingress and egress is supplied by a stevedore." Defs.' Br. in Opp'n at 14, ECF No. 55. In support of their argument, the Mullens rely on cases from other circuits for the proposition that the turnover duty includes "a duty to ensure that a safe means of access is provided for longshoremen coming to work on [the] vessel." Id. at 15. The Mullens also cite two cases from the Fourth Circuit that the Mullens allege extend a shipowner's duty of care "to the means of access, no matter who owns or controls it." Id. For the following reasons, the Court is not persuaded by the cases cited by the Mullens and declines the invitation to establish such a duty in the § 905(b) context.

### i. Reyes and its Unintended Following

All of the cases cited by the Mullens in support of their argument rely, either directly or indirectly, upon the First Circuit's decision in Reyes v. Marine Enterprises, Inc., 494

F.2d 866 (1st Cir. 1974).[7]  However, the holding of Reyes is inapposite.  In Reyes, a longshoreman was injured when "he attempted to board [the barge] and fell from the gangway," which "did not belong to the barge or its owner." Reyes, 494 F.2d at 868, 869.  Because the longshoreman was injured before the 1972 amendments to the LHWCA took effect, the plaintiff longshoreman properly brought suit under theories of both unseaworthiness and negligence.  Id. at 868 n.1.[8]  The district court directed a verdict for the shipowner after "conclud[ing] that the injury was caused by 'pierside equipment not part of the ship or its appurtenances and that there was no member of the crew of the ship directing the plaintiff or his activities at the time.'" Id. at 869.

On appeal, the First Circuit Court of Appeals disagreed, holding that a vessel owner's seaworthiness duty "includes providing [the vessel's crew] with a suitable means to board and

---

[7] See, e.g., Scheuring v. Traylor Bros., Inc., 476 F.3d 781, 790 (9th Cir. 2007) (relying upon Reyes and Gay v. Barge 266, 915 F.2d 1007 (5th Cir. 1990), which relied indirectly upon Reyes, to declare that "the turnover duty, at a minimum, requires a vessel to provide a safe means of access"); Gay, 915 F.2d at 1013 (relying upon Sarauw v. Oceanic Navigation Corp., 655 F.2d 526 (3d Cir. 1981), which, in turn, relied upon Reyes, to acknowledge a shipowner's "duty of care with respect to providing a proper gangway"); Sarauw, 655 F.2d at 528 (relying upon Reyes to hold that the shipowner "could not divest itself" from the "duty to exercise reasonable care with respect to the gangway's being properly secured to the vessel and maintained in a safe condition").

[8] "Prior to 1972, a longshoreman injured while loading or unloading a ship could receive compensation payments and also have judgment against the shipowner if the injury was caused by the ship's unseaworthiness or negligence."  Scindia, 451 U.S. at 164 (citing Sieracki).

disembark." Id. The court then held that the vessel's seaworthiness duty extends "to the gangway by whomever supplied, owned, or controlled." Id. Acknowledging the harshness of holding a vessel owner responsible "for the fault of a shore-based operator," the court noted that a vessel "owner may often be entitled to indemnity" and, therefore, "'[t]he fact that the unseaworthy condition [is] the fault of [the longshoreman's] employer, and not the defendant, [is] immaterial.'" Reyes, 494 F.2d at 869 n.3 (quoting Bostrom v. Astro Crecido CIA, 477 F.2d 718, 720 (1st Cir. 1973)).[9] Then, in a single paragraph, the Reyes court concluded its opinion with its "views on the negligence claim . . ., though with perhaps less certainty," stating:

> Because the means of ingress and egress, by whomever furnished, are an "appurtenance" of the vessel, the owner has a duty of care regarding them. The owner is thus liable for a negligent failure to inspect a gangway and to warn against defects reasonably apparent from inspection or to take steps to repair or replace it.

Id. at 870. In establishing the duty of care regarding the means of ingress and egress, the court emphasized that it had "refer[red] to cases preceding the [1972] Amendments to the [LHWCA]," reiterating that, because the Amendments did not apply to Reyes's injury, the court "[had] no need to consider, and

---

[9] The 1972 Amendments to the LHWCA also abolished "the stevedore's obligation to indemnify the shipowner if the latter was held liable to the longshoreman." Scindia, 451 U.S. at 165.

[did] not consider, what duties and liabilities may exist under the 1972 Amendments." Id. at 870 n.4.  The court then held that "Reyes was entitled to take his case to the jury on the issues of both unseaworthiness and negligence." Id. at 870.[10]

Certainly, the law "prior to the 1972 Amendments to the [LHWCA]" allowed a longshoreman to recover for a "shipowner's negligent breach of its nondelegable duty to provide a safe place to work to all who come aboard its vessel." Bess v. Agromar Line, 518 F.2d 738, 740 (4th Cir. 1975); see also Scindia, 451 U.S. at 164.  However, the Fourth Circuit has expressly declined to find, "as a matter of law, a duty on the shipowner to provide [a safe place to work] . . . under negligence principles," by relying upon "cases arising prior to the 1972 Amendments to the Act [that] clearly proceeded upon the doctrine of seaworthiness or upon the nondelegable duty to provide a safe place to work." Bess, 518 F.2d at 743.  Because it is beyond question that the Reyes court considered only cases prior to the 1972 Amendments in establishing the duty of care owed by the shipowner to the plaintiff injured before the 1972 Amendments became effective, this Court declines to rely upon the inapposite holding set forth in Reyes.

---

[10] The Mullens mistakenly assert on brief that the First Circuit held in Reyes that the "barge owner was liable for negligent failure to inspect [a] gangway supplied by [a] third party." Defs.' Br. in Opp. at 15, ECF No. 55 (citing Reyes, 494 F.2d at 870).

### ii. Fourth Circuit "Precedent"

The Mullens also submit to the Court two cases from the Fourth Circuit "cit[ing] with approval the case of Romero Reyes . . . for the proposition that a shipowner's duty of care extends to the means of access, no matter who owns or controls it." Defs.' Br. in Opp'n at 15, ECF No. 55 (citing White v. United States, 53 F.3d 43, 46 (4th Cir. 1995); Russell v. City Ice & Fuel, 539 F.2d 1318, 1320 (4th Cir. 1976)). However, neither White nor Russell stands for the broad proposition suggested by the Mullens.

In White, not only did the Fourth Circuit not hold "that a shipowner's duty of care extends to the means of access, no matter who owns or controls it," Defs.' Br. in Opp'n at 15, ECF No. 55, it did not even consider the issue. Rather, the issue in White was simply whether "the district court was properly vested with admiralty jurisdiction" where the plaintiff had fallen "onto a small wooden platform at the end of the gangway" while disembarking from a vessel. White, 53 F.3d at 44. In a footnote, the Court listed Reyes as one "of the many gangway cases we have considered since [The] Admiral Peoples[, 295 U.S. 649 (1935)]," for the proposition "that the rule of Admiral Peoples extending jurisdiction to the gangplank is [still] good law following the enactment of the Extension Act in 1949." White, 53 F.3d at 46 & n.3 (emphasis added). Therefore, because

22

the Court in White considered only issues of admiralty jurisdiction, the holding of White neither applies nor controls in this case.

Likewise, Russell does not apply in this case because it addressed the doctrine of seaworthiness, not 33 U.S.C. § 905(b) negligence. There, the Fourth Circuit stated the well-established rule "that a vessel in navigation ordinarily warrants the seaworthiness of the means provided for members of its crew to board and to disembark." Russell, 539 F.2d at 1320 (emphasis added). The Court, noting that "a vessel's warrant[y] of seaworthiness does not extend beyond the gangway to the dock," held that the "fuel flat involved [t]here, however, was not a gangway; it was a part of the dock." Id. As in White, the Court listed Reyes in a footnote, citing it as one of several cases supporting the Court's observation that the seaworthiness "warranty of means of ingress and egress includes a gangway by whomever owned or controlled when supplied for such a purpose." Russell, 539 F.2d at 1320 & n.2. Accordingly, although the Fourth Circuit has clearly recognized such a duty of a vessel to its crew in the seaworthiness context, id., it has not yet done so in a 33 U.S.C. § 905(b) context, and this Court declines the invitation to establish such a duty.

23

### iii. **Sarauw** and its **Instructive Reasoning**

Although the Court need not distinguish every case cited by the Mullens from the facts of this case, the reasoning of the Third Circuit in Sarauw v. Oceanic Navigation Corp., 655 F.2d 526 (3d Cir. 1981) is instructive in determining, based upon certain specific facts, whether a shipowner owes a reasonable duty of care regarding a gangway owned by a third party, such as a stevedore.

A brief recitation of the relevant factual and procedural background of Sarauw is necessary. There, the stevedore had supplied the vessel with a small gangway for use until the water rose to a certain level. Sarauw v. Oceanic Navigation Corp., 622 F.2d 1168, 1171 (3d Cir. 1980) [hereinafter Sarauw I]. The stevedore put the small gangway in place, but the vessel's crew failed to properly secure the gangway to the vessel. When the water reached the "point where the small gangway had to be replaced with a longer one," the plaintiff longshoreman proceeded to "swing the longer gangway into position." Id. When the longshoreman could not "attract the attention of anyone aboard the ship" to secure the longer gangway, he "started [walking] up the small gangway[,] which . . . suddenly came loose," causing the longshoreman to fall. Id.

At trial, the jury found that the longshoreman, the vessel owner, and the stevedore were all negligent. On appeal, the

Third Circuit affirmed the jury's finding that the vessel owner had been negligent in failing to properly secure the gangway to the vessel. Id. at 1173. The vessel owner appealed to the Supreme Court, which remanded to the Third Circuit for reconsideration in light of its decision in Scindia. See Oceanic Navigation Corp. v. Sarauw, 451 U.S. 966 (1981).

Upon reconsideration, the court first acknowledged the Supreme Court's instruction in Scindia that, "'absent contract provision, positive law or custom to the contrary . . . the shipowner has no general duty . . . to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore.'" Sarauw, 655 F.2d at 528 [hereinafter Sarauw II] (quoting Scindia, 451 U.S. at 172). The court then characterized the issue before it "in the light of the ruling of the Supreme Court in Scindia," stating:

> The precise question which this case presents on remand is whether the gangway here involved which was supplied by the stevedore and used by its longshoremen was an appliance which was "within the confines of the cargo operations" assigned to the stevedore.

Id. If so, the court explained, the gangway would necessarily fall "outside the general duty of the shipowner to use reasonable care to inspect and supervise for the purpose of discovering and remedying dangerous conditions which might exist or develop in the course of its use." Id.

25

Considering the particular gangway at issue, the Sarauw II court reaffirmed its "original conclusion [in Sarauw I] that [the vessel owner] had the duty to exercise reasonable care with respect to the gangway's being properly secured to the vessel and maintained in safe condition for use." Id.  The court explained how it had come to its "original conclusion," noting that the stevedore "required all vessels unloading at its terminal to use only gangways supplied by it, the stevedore." Id.  Moreover, "the shipowner maintained control over the manner in which the gangway was to be secured" and certain testimony presented at trial further established the shipowner's duty "to secure, maintain, and watch over the gangway."  Id. at 529 (Adams, J., concurring); see also Sarauw I, 622 F.2d at 1172 (describing expert's testimony "that the officer in charge of the ship was responsible for seeing that the gangway was properly secured and that a gangway watch would be the customary method of fulfilling that responsibility").  Thus, the court held, because the shipowner "did not surrender control over the manner in which the gangway was to be secured," Sarauw I, 622 F.2d at 1172, the shipowner "could not divest itself" of the "duty of care . . . even though the gangway was supplied by the stevedore."  Sarauw II, 655 F.2d at 528 (citing Reyes, 494 F.2d at 870).[11]

---

[11] The Fifth Circuit relied upon this holding in Gay, 915 F.2d at 1012 & n.18 (noting in a dual-capacity case that, where employee acts

It is apparent to the Court that the holding of Sarauw II was specific to the facts of that case and was not intended to impose a general duty of care upon all vessel owners for all means of ingress and egress to and from their vessels. Indeed, the court hypothesized about certain situations where a shipowner would presumably owe no such duty:

> Conceivably, there might be a case in which a special gangway, which is in addition to the ship's regular gangway, is supplied by a stevedore for the exclusive use of its longshoremen in carrying out its cargo operation and which, therefore, might be regarded as wholly within the confines of that operation under the Scindia rule.

Id. It is equally apparent that the reasoning of Sarauw II, applied to the facts of this case, fails to support the Mullens' argument that Plaintiffs' turnover duty included the forklift-and-basket method of accessing the barge. It is undisputed that Ceres owned, maintained, and controlled the forklift and basket, and, unlike in Sarauw II, there is no evidence that Plaintiffs exercised any control over the forklift and basket, such that Plaintiffs could be said to have assumed an affirmative duty to "secure, maintain, and watch over the [means of access to the barge]." Id. at 529. Nor was the forklift-and-basket combination the sole means of accessing the barge. Although Mullen alleges that the barge's "ladder was not accessible from

---

as agent of defendant in capacity of both shipowner and stevedore, defendant "as shipowner" cannot divest itself of its "duty of care with respect to providing a proper gangway" by relying on actions of employee acting for defendant as "stevedore-employer").

the dock" on August 31, 2009, Mullen Decl. ¶ 21, ECF No. 55-1, he concedes that port captains use the barge ladder to board when "the barge ladder and the top of the dock bumper should happen to be lined up," Defs.' Br. in Opp'n at 19, ECF No. 55; accord Moulton Dep. at 52, 78, ECF No. 47-1 (testifying that port captains "typically" use the "ladder and climb on board the barge," although "sometimes they [need] to use the basket" when the ladder is not "lined up with one of the bumpers"). Nor do the Mullens allege that Ceres "required all vessels unloading at its terminal to use only [means of access] supplied by it, the stevedore." Sarauw II, 655 F.2d at 528. Thus, there being no evidence of "'contract provision, positive law or custom to the contrary,'" Plaintiffs owed no "general duty . . . to use reasonable care to inspect and supervise [the forklift and basket] for the purpose of discovering and remedying dangerous conditions which might exist or develop in the course of its use." Id. (quoting Scindia, 451 U.S. at 172).

Moreover, although the Court need not decide in this case whether the forklift-and-basket method of accessing the barge was "wholly within the confines of that operation under the Scindia rule," id., it appears that Ceres' forklift and basket might be just the sort of "special" case the Sarauw II court had in mind, especially considering the specific requirements of reefer mechanics, such as Mullen. Mullen's sworn declaration

states that barges "frequently have reefer units on more than one section (bay) of the barge," and that those refrigerated "units will be unloaded at different times during the cargo operation." Mullen Dep. ¶ 15, ECF No. 55-1. Because the units should not "sit[] too long on the vessel without power," they "should be unplugged close to the time when they are to be unloaded." Id. Coupled with the fact that only "one reefer mechanic is assigned to work on the whole barge," the "reefer mechanic frequently has to board and disembark from the container barge . . . multiple times during a cargo operation." Id. Hence, the portability of the forklift-and-basket combination enables a reefer mechanic to access the barge near the location of the specific unit requiring service at the appropriate time. One can easily imagine the additional time that would be needed for each service, were the reefer mechanic required to access the barge using a single ladder or gangway located in a fixed area of the barge in order to reach units located in "more than one section (bay) of the barge." Id. This suggests that the forklift-and-basket method of accessing the barge was specifically intended for use "'within the confines of the cargo operations assigned to the stevedore.'" Sarauw II, 655 F.2d at 528 (quoting Scindia, 451 U.S. at 172). Furthermore, Mullen's injury occurred "at about 4:00 a.m." on August 31, 2009, only when Mullen had to service the "reefer

29

units . . . near the barge ladder," Mullen Decl. ¶ 28, ECF No.
55-1.  As Mullen points out, it was not until the "Ceres
forklift operator brought [Mullen] next to the barge ladder and
began raising the basket," that the forklift prong "caught
against one of the rungs on the barge ladder" and caused his
injury.  Id.

In sum, the Court finds the Fourth Circuit authority cited
by the Mullens inapplicable to this case.  Furthermore, the
Court rejects the holdings of the remaining cases relying upon
Reyes, primarily because of Reyes's reliance upon "cases arising
prior to the 1972 Amendments to the Act [that] clearly proceeded
upon the doctrine of seaworthiness or upon the nondelegable duty
to provide a safe place to work."   Bess, 518 F.2d at 743.
However, applying the reasoning of Sarauw II, one of the cases
cited by the Mullens, to the specific facts of this case, the
Court finds that Plaintiffs' turnover duty did not extend to
Ceres' forklift-and-basket method of accessing the barge.   In
any event, even if a factual scenario may exist, as Sarauw II
suggests, where it could be said that, as a matter of law, a
vessel owes a duty to provide a safe means of ingress and egress
to a longshoreman, this is not that case and the Court leaves
that question for another day.

30

### b. Active Control Duty

The active control duty provides that, once stevedoring operations have begun, "a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel.'" Howlett, 512 U.S. at 98 (quoting Scindia, 451 U.S. at 167). The Mullens make no assertion that Plaintiffs maintained "active control of the [barge]" after delivering the barge to the stevedore or that Plaintiffs breached their active control duty. Id. Thus, the Court finds no genuine issue of material fact with respect to Plaintiffs' active control duty.

### c. Duty to Intervene

The Mullens assert that Plaintiffs breached their duty to intervene because Plaintiffs were "'deemed to have been aware'" of the "inherently dangerous" method of accessing the barge and that the "continual use of this method was obviously improvident." Defs.' Br. in Opp'n at 22-23, ECF No. 55 (quoting Scindia, 451 U.S. at 176). Plaintiffs disagree, alleging that the only danger was in "the manner in which [the method] was operated in this one instance," Pls.' Br. at 19, ECF No. 47. Furthermore, Plaintiffs contend, "there are no facts that can show that the vessel owner had actual knowledge of a dangerous condition or that the stevedore exercised 'obviously improvident' judgment." Id. (citation omitted).

"As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards." Scindia, 451 U.S. at 170. Nonetheless, "there may be circumstances in which it would not be reasonable for the shipowner to assume that the stevedore will correct the problem." Id. at 174 (citation and internal quotation marks omitted). In such "circumstances," where a "danger to longshoremen arises from the malfunctioning of the ship's gear being used in the cargo operations," Scindia, 451 U.S. at 175, the "shipowner has a duty to intervene when a stevedore's decision to continue operations[,] despite a known hazard[,] presents an unreasonable risk of harm to the longshoremen," Harris, 967 F. Supp. at 164 (citing Scindia, 451 U.S. at 176). Even where a hazardous condition is "obvious and known to all," the vessel owner has a duty "to intervene and stop unloading operations when the stevedore's judgment in carrying out his tasks is 'obviously improvident.'" Bonds, 717 F.2d at 127 (quoting Scindia, 451 U.S. at 167, 175); see also Woodruff v. United States, 710 F.2d 128, 130 (4th Cir. 1982) (citing Gill v. Hango Shipowners/AB, 682 F.2d 1070, 1074 (4th Cir. 1982); Harris v. Reederei, 657 F.2d 53 (4th Cir. 1981)) (observing that "the injury to the longshoreman must be a 'reasonably foreseeable' consequence of exposure to the open and obvious hazard for the shipowner to be liable").

Of course, it is well-established that there can be no duty to intervene unless the vessel owner has both "knowledge of the [hazardous] condition" and "knowledge that despite the danger, the stevedore is continuing its operations." Hodges v. Evisea Mar. Co., S.A., 801 F.2d 678, 686-87 (4th Cir. 1986) (citing Scindia, 451 U.S. at 175-76). Furthermore, even if the vessel owner knows of a dangerous condition, but "reasonably believe[s] . . . that the stevedore will act to avoid the dangerous condition[], the owner cannot be said to have been negligent, for the decision whether a condition imposes an unreasonable risk of harm to longshoremen is 'a matter of judgment committed to the stevedore in the first instance.'" Id. at 687 (quoting Scindia, 451 U.S. at 175).

In this case, as indicated above, the forklift-and-basket combination was wholly owned, maintained, and controlled by Ceres; thus, any alleged "danger to longshoremen" from accessing the barge via the forklift and basket did not "arise[] from the malfunctioning of the ship's gear being used in the cargo operations." Scindia, 451 U.S. at 175 (emphasis added).[12]

---

[12] The Court acknowledges some disagreement among the circuits as to whether the duty to intervene "extend[s] beyond conditions with respect to the ship, its equipment, and gear," Derr v. Kawasaki Kisen K.K., 835 F.2d 490, 496 (3d Cir. 1987), see, e.g., Fontenot v. United States, 89 F.3d 205, 209 (5th Cir. 1996) (noting that "whether the danger was located in the ship or ship's gear" was only one of six factors in determining "whether the vessel owner has a duty to intervene"); Futo v. Lykes Bros. Steamship Co., 742 F.2d 209, 215 (5th Cir. 1984) (declining to adopt an "across-the-board rule that the involvement of a dangerous condition of the ship itself, its gear, or equipment is in all circumstances per se either necessary or

Furthermore, regardless of whether Plaintiffs had "knowledge of the condition," Hodges, 801 F.2d at 686, any "inherent[] danger[]" to the longshoremen in using the forklift-and-basket method of accessing the barge, Defs.' Br. in Opp'n at 22-23, ECF No. 55, was "obvious and known to all," Bonds, 717 F.2d at 127. Indeed, Mullen himself acknowledges that it "is easy to see from the dock or from the basket" that "the forklift blades . . . would stick out beyond the forward edge of the basket," Mullen Decl. ¶ 23, ECF No. 55-1, thus rendering it "entirely foreseeable" that "a forklift blade might "catch . . . against a barge ladder rung," Defs.' Br. in Opp'n at 21, ECF No. 55. As the Fourth Circuit held in Bonds, the danger "being obvious and known to all, the shipowner was entitled to rely on [Ceres'] judgment as to whether discharge operations could safely be undertaken," unless Ceres' "judgment in proceeding under the circumstances was 'obviously improvident.'" Bonds, 717 F.2d at 127-28 (quoting Scindia, 451 U.S. at 175). As in Bonds, "there were several safe locations from which the [longshoremen] could carry out [their] tasks," id. at 128 n.5, such as the other "gaps in the lines along the side of the barge" located away

---

sufficient to impose a duty on a shipowner"); Lieggi v. Maritime Co. of Philippines, 667 F.2d 324, 328 (2d Cir. 1981) (formulating "a more general principle, applicable not only to the ship's gear but also to transitory conditions on the ship"). However, the Court need not address this issue because the Mullens present no specific facts suggesting that "the stevedore's judgment in carrying out his tasks [was] obviously improvident," Bonds, 717 F.2d at 127 (emphasis added), or that Plaintiffs otherwise had any "knowledge of the [hazardous] condition." Hodges, 801 F.2d at 686.

from the barge ladder, Mullen Decl. ¶ 16, ECF No. 55-1; see also Defs.' Br. in Opp'n at 20, ECF No. 55 (noting that "longshoremen typically boarded [the barge] at the two to four places along the side of [the] barge where there were gaps in the barge's safety lines," and that only one of those gaps was located near "the barge ladder"). "This is not a situation, then, in which the longshoremen were precluded from performing their tasks except by a means which was inherently dangerous." Bonds, 717 F.2d at 128 n.5. Accordingly, because "it would be antithetical for the court to conclude under [Bonds and] Scindia that the conduct of [Ceres] was 'obviously improvident,'" id. at 128 (quoting Scindia, 451 U.S. at 175, and "that the shipowner had a duty to intervene and stop the [cargo] operations," id., the Court finds that Plaintiffs are "entitled to judgment as a matter of law" regarding their alleged duty to intervene, Fed. R. Civ. P. 56(a).

In summary, the Court finds that, because Plaintiffs did not violate any of the "three general duties shipowners owe to longshoremen," Howlett, 512 U.S. at 98 (citing Scindia, 451 U.S. at 167-78), Mullen's injury was not "caused by the negligence of the vessel," In re Complaint of Christiansen Marine, Inc., 1996 AMC 2353, 2363 (E.D. Va. 1996). Accordingly, Plaintiffs are entitled to summary judgment and "exoneration from all claims against [them]." Id. at 2366. Furthermore, the Court's

35

determination with respect to Plaintiffs' Motion for Summary Judgment renders moot Ceres' claim seeking contribution if "Ceres and Columbia are found jointly liable for the Mullens['] injuries," Ceres' Answer & Claim at ¶ 11, ECF No. 14, and the Court will **DISMISS** Ceres' contribution claim on that basis.

### IV. CONCLUSION

For the reasons set forth above, the Mullens' motion for relief pursuant to Fed. R. Civ. P. Rule 56(d) is **DISMISSED AS MOOT**, as the discovery disputes have since been resolved and, in any event, the evidence sought would not have aided the Court in its decision. Plaintiffs' motion for summary judgment is **GRANTED**, as the Mullens have failed to show that there is any genuine issue of material fact as to whether Plaintiffs violated any of the duties owed to them. Therefore, the Mullens' claims against Plaintiffs are **DISMISSED WITH PREJUDICE**, and Ceres' contribution claim against Limitation Plaintiffs is **DISMISSED AS MOOT**, as Plaintiffs are not liable to the Mullens for their negligence claims.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ _Mark S. Davis_
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
January 10 , 2014